## Shields *v.* Larry Construction Company, Inc., Appellant.

Argued April 1, 1952. Before Drew, C. J., Stearne, Jones, Bell, Chidsey and Musmanno, JJ.

*Arthur Grossman,* for appellant.

*John E. Evans, Jr.,* with him *M. E. Evashwick* and *Evans, Ivory & Evans,* for appellee.

Opinion by Mr. Justice Chidsey, May 29, 1952:

The plaintiff, Lawrence A. Shields, instituted an action in trespass against Larry Construction Com-

pany, Inc. to recover damages for personal injuries sustained when he fell into a hole allegedly created and negligently left unguarded by the defendant on a street pathway used by the public. The jury found a verdict for plaintiff in the sum of $35,000. Defendant appeals from the judgment entered on the verdict following dismissal of its motion for new trial.

The accident occurred at 3 a.m. on Sunday, July 13, 1947, at or near the southwest corner of the intersection of Greensburg Pike and Tintsman Avenue in Turtle Creek, Allegheny County. Greensburg Pike runs north and south and Tintsman Avenue east and west. There was no sidewalk along the southerly side of the latter but a pathway that was used by the public. Near the corner and beside the pathway was a catch basin owned by the County of Allegheny which had existed for over twenty years. On July 11th, the Friday before the accident, the defendant construction company pursuant to its contract with the county covering various repairs and alterations along Greensburg Pike, dug a ditch across Tintsman Avenue and installed a 16-inch sewer pipe running two feet under the surface and leading to the old catch basin. Plaintiff, who lived on the avenue about two blocks west of the pike, left a party of friends at a firehouse in the community to return to his home. He walked northwardly on the pike to the avenue and started to proceed westward on the pathway when, according to his testimony, he fell into a hole about four feet wide and four feet deep that adjoined the northern end of the catch basin. He testified that he crawled from the hole into the catch basin. About a half hour later two neighbors passing by heard him call and one of them helped him out of the basin. He suffered injuries and was taken to the hospital.

Plaintiff testified there was no street light at the intersection; that he saw a pile of dirt on each side of

the avenue near the pike; that there was a smudge pot or flare on the far pile but none on the pile on the south side of the street which was about five or six feet from the catch basin and cast a shadow to the south on the pathway where the hole was located. There were no barricades or warning signs and the hole was uncovered.

Appellant's contentions are: (1) that the lower court abused its discretion in not holding that a verdict favorable to the plaintiff was against the weight of the evidence; (2) that the trial judge erred in admitting into evidence the testimony of a physician given at a previous trial of the case; (3) that the trial judge in his charge to the jury made an improper comment with respect to the closing address of defendant's counsel, and (4) that the verdict was excessive.

(1) At the trial defendant contended that plaintiff fell into the catch basin of which he had knowledge, and that no hole existed as testified to by him. A number of witnesses were called by defendant in support of this latter contention, including the president of the defendant corporation, the foreman on the job and a construction engineer employed by the County of Allegheny. On the other hand five witnesses were called by the plaintiff, including his wife and brother-in-law, who corroborated his story as to the existence of the hole. Thus there was testimony on the part of a number of witnesses on each side on a main issue in the case, and the credence given to one or the other set of witnesses was largely determinative of the truthfulness of the plaintiff's account of the accident. The credibility of the witnesses and resolution of the conflict in their testimony was for the jury. In the absence of a palpable abuse of discretion, this Court will not reverse the refusal of the court below to grant a new trial on the ground that the verdict was against the weight of the evidence: *Yago et al. v. Pipicelli,* 343 Pa.

222, 22 A. 2d 699; *Dupont v. Gallagher*, 360 Pa. 419, 62 A. 2d 28. We have reviewed the evidence in this case and are of the opinion that the lower court properly refused to disturb the jury's findings on the issues of negligence and contributory negligence.

(2) During the course of the trial plaintiff offered the testimony given by Dr. Ritter at the previous trial of the case on the ground of the physician's inability to appear because of illness. He had testified extensively on direct and cross-examination at the earlier trial. This prior testimony was admitted over appellant's objection.

Under the Act of May 23, 1887, P.L. 158, §9, 28 PS §327, testimony given in a former proceeding between the parties is admissible where the witness is unable to attend because of sickness: *Perrin v. Wells et al.*, 155 Pa. 299, 26 A. 543; *Commonwealth v. McFeaters*, 100 Pa. Superior Ct. 169; *Knights of Pythias Benevolent Association of Coal Centre, Penna. v. R. L. Leadbeter, Samuel Abercrombie and Elah Hicks*, 2 Pa. Superior Ct. 461. Appellant challenges the sufficiency of plaintiff's proof of the doctor's inability to attend. Plaintiff's counsel called as a witness the doctor's office nurse who in substance testified that while she was unable to say how seriously ill the doctor was, he was unable to practice or to go to his office. The question of the sufficiency of the preliminary proof as to the absence of a witness is largely a matter of discretion with the lower court: See *Delahunt v. United Telephone & Telegraph Company*, 215 Pa. 241, 64 A. 515; *Commonwealth of Pennsylvania v. DiNatale et al.*, 93 Pa. Superior Ct. 508. We find no abuse of discretion here.

The two cases cited by appellant are clearly distinguishable. In *Commonwealth v. Cilione*, 293 Pa. 208, 142 A. 216, in holding that testimony taken at a previous trial was properly excluded, this Court said

at p. 217: "Defendant's offer to prove his inability to call the two witnesses consisted merely of the statement that one of them was 'sick,' and that the subpoena server had been unable to obtain service on the other." In *Ferguson v. Barber Asphalt Paving Company,* 59 Pa. Superior Ct. 386, a witness at the time of testifying at the first trial of the case resided in Atlantic City, New Jersey. The lower court permitted his testimony given at the first trial to be read at the second on the mere assumption that the witness was still a nonresident. In declaring this to be error, the Superior Court at p. 391 said: "We are not prepared to establish a rule, in support of which no pertinent authorities have been presented, that the mere statement of a witness at a trial that he resides in a neighboring state is sufficient to entitle his testimony to be read at a subsequent trial without any preliminary proof that the witness's presence is not procurable."

(3) In its statement of questions involved, appellant's third contention is set forth as follows: "The trial court erred in charging the jury, in effect, to disregard the closing argument of defendant's counsel." The portion of the charge complained of reads: "When these men argued the case to you they said, 'You *have* to do this' or 'you have to do that.' I think that is an unfortunate word. You don't have to do anything. When any person stands up and says to me 'You have to do this or that,' I generally buckle up and fight and show him I don't have to; and I am stubborn in that respect. What they mean is 'You should.'". We think it is stretching matters to consider the comment as a direction to the jury to disregard the arguments of counsel. A trial judge must not "discredit the arguments of counsel by a contemptuous characterization of them": *Commonwealth v. Brown,* 309 Pa. 515, 164. A. 726, nor direct the jury "to ignore an argument of coun-

sel made with entire propriety": *Commonwealth v.
Wood et al.,* 118 Pa. Superior Ct. 269, 179 A. 756. The
comment of the trial judge in the present case ob-
viously does not come within these prohibitions.

However, it is not necessary to critically analyze the
propriety of the comment, because counsel did not ob-
ject at the time it was made or make any reference
thereto when the trial judge at the conclusion of his
charge said: ". . . if counsel on either side have any-
thing they wish me to say, let me know." Counsel for
appellant made some requests with respect to the charge
with which the court complied, but counsel did not call
the court's attention to the portion of the charge now
complained of. If counsel felt aggrieved, then was the
time for him to speak. See *Dupont v. Gallagher,* supra;
*Gallup v. Pittsburgh Railways Co.,* 295 Pa. 203, 145
A. 73; *Ross v. Riffle,* 310 Pa. 176, 164 A. 913.

(4) At the first trial of this case the jury awarded
plaintiff the sum of $3,000. At this trial the award was
$35,000. Is this verdict excessive? The plaintiff who
was 35 years of age, was hospitalized for one week.
His hospital and medical bills amounted to $278.50.
Five months after the accident he returned to work
with Westinghouse Electric Corporation and worked
there steadily, with considerable overtime, until August,
1949, a period of one year and eight months. During
the five months that he was disabled his loss of wages
totalled $1,300. The question narrows to whether an
award of $33,421.50 for pain and impairment of earn-
ing power was justified.

The injuries received as a result of the accident and
for which he received treatment were in and about the
left knee. Dr. Joseph A. Coyle, Chief of the Orthopedic
Department of the Braddock General Hospital, treated
the plaintiff during his week of hospitalization and
saw him once or twice thereafter. He described the

plaintiff's injury as an inter-articular fracture involving the medial tibial plateau, extending into a joint of the left knee and causing damage to the joint cartilage. The leg was placed in a cast. When the cast was removed about three months later, Dr. Coyle found the fracture completely and satisfactorily healed. He testified that his final examination of plaintiff on April 2, 1949 showed a twenty degree flexion in the injured knee. Dr. Ritter, who treated plaintiff five or six times in the early part of 1948, testified that he found only a ten degree flexion. Although Dr. Coyle did not testify to any injury thereto, Dr. Ritter said plaintiff's left ankle was also injured. Both doctors testified that plaintiff's injuries were of a permanent nature. Dr. Ritter said that plaintiff could not do heavy lifting. Dr. Coyle gave it as his opinion that the plaintiff will continue to have a painful unstable knee joint.

Plaintiff was severly handicapped physically before the accident. As a result of an injury and tubercular infection in childhood, he had a shortage of three or three and one-half inches in his left leg and a completely ankylosed left hip joint so that his left leg above the knee was in a fixed position and could not be moved backward, forward or sideways. Dr. Ritter testified that atrophy in the functioning of the left leg was due to both the injury in childhood and the accident in 1947 and could not say how much of the atrophy existed before the accident. Dr. Coyle testified that the hip condition was not aggravated by the accident and that it was of significance in the determination of his present handicap. In this connection the doctor testified that because of the loss of flexion in the knee, plaintiff, when sitting, cannot bring his foot against his chair or seat but he also testified that "Owing to the fact that he has a stiff hip, he must sit in an uncomfortable manner, even with a normal knee joint."

The plaintiff called a Dr. Rosen who had not treated plaintiff but had examined him the day before the present trial for the purpose of testifying on his behalf. This was almost four years after the accident. Although the examination by Dr. Coyle during plaintiff's hospitalization revealed no fracture or injury to the ankle and no traumatic pathology in the back, Dr. Rosen testified to a forty or fifty percent loss of motion in the ankle and to pain in the back attributable to the accident. Dr. Ritter testified that the ankle motion is normal for stepping but his left foot could not be raised as high as the right. He also testified that plaintiff suffered pain in the back. Dr. Rosen expanded the adverse result of plaintiff's injuries and doubted very much if plaintiff "would be able to obtain employment with a new employer."

C. J. Wertz, the supervisor of the payroll division of the Westinghouse Company, produced its records bearing on plaintiff's employment. He testified that the plaintiff was laid off on August 1, 1949 because of his lack of seniority but was rehired on February 27, 1951 and was working at the time of the trial. Prior to the accident plaintiff had earned $50 to $60 a week. Upon his return he received $70. If he had returned to his former job, because of two general wage raises, he would have received $95 per week. However, Wertz testified that plaintiff was given a job different from that which he previously had solely because of his loss of seniority and in no way as the result of his physical condition. This testimony was not contradicted. In fixing an amount to compensate plaintiff for his loss of earning capacity, his earlier physical handicap must be taken into consideration. On the other hand, the medical prognosis is that he will continue to have an unstable knee joint and permanently suffer pain as the result of the injuries received in the accident. There is always

inherent difficulty in measuring pain and suffering by a money standard, and sympathy often impels undue generosity in this regard. The law requires just compensation. Under all the circumstances in this case we think a fair and just verdict, after including actual loss of wages, hospital and medical expenses, should not have exceeded $20,000.

The judgment, reduced to $20,000, is affirmed.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

The only question before this Court is the amount of the verdict.

When the plaintiff was five years of age he underwent an operation which somewhat immobilized his left hip joint but not enough to impede him in his varied activities in the succeeding years of his life. His health was good, he played basketball, baseball, football, danced and engaged in all the sports of enthusiastic youth. And he worked regularly at remunerative employment.

On July 13, 1947, he suffered an accident which destroyed the efficacy of his left knee joint, disabled his left ankle and caused a limitation of motion in the spine, all of which disabilities carried their concomitant pain and physical torture. Dr. Richard C. Ritter testified: "A. * * * In other words, the knee will not move due to adhesions and so forth, due to the fibrous ankylosis which is present or limitation of motion. The motion is associated with pain and loss of stability which is gradually getting worse. That keeps on. The condition in his back is aggravated as he has to limp more than he should and it keeps the condition in his ankle aggravated as he has to walk in an abnormal manner."

In December, 1947, the plaintiff returned to work because a friend transported him to and from his place of employment by automobile. From August, 1949 to February, 1951, when he was on involuntary furlough, he tried to obtain employment elsewhere, but was turned down because of the infirmities occasioned by the fall which is the subject of this law-suit.

The plaintiff, now 39 years of age, has a life expectancy of 30.91 years, according to the Commissioner's Standard Mortality Table. Should he lose his job at the Westinghouse Plant, where he holds on because of his previous faithful service, and where he has already suffered a decrease in earning power, it is practically certain no one else would employ him. He is incapable of doing any work requiring heavy lifting or bending of his knee. He has difficulty in walking and he cannot stand any length of time. Dr. Joseph A. Coyle testified through depositions that the plaintiff's frequent swelling and feeling of insecurity in his left knee "handicaps him in standing, walking and sitting down." The plaintiff cannot even bend over sufficiently to put on his shoes and socks.

Dr. Ritter summed up the plaintiff's fate by declaring that because of the tragic mishap of July 13, 1947, caused by the defendant's negligence, the plaintiff has become what is perhaps the most doleful and disspiriting sight that one encounters on the highway of life, a "permanent cripple."

A permanent cripple is an object of constant pity and a subject for repeated discard. He awakens sympathy but not assistance, he arouses compassion but not employment. In the economic world he is the last one to be employed and the first one to be discharged. In the race of life for the awards of comfort, promotion and happiness, he always arrives last. In the words of John Davidson:

"In anguish we uplift
A new unhallowed song;
The race is to the swift;
The battle to the strong."

No one can restore to the plaintiff the vigor of health and the sturdiness of limb he enjoyed prior to the night of July 13, 1947, but the jury sitting upon his case concluded that a verdict of $35,000 would offer a compensation assuring him for the next thirty years the necessities of life which might otherwise not be vouchsafed.

$35,000 sounds like a great deal of money—and it is. Looked at closely, it bulks into a good sized package but spread over thirty years it thins out considerably. And then, when it passes through the wringer of present day inflation the package shrinks even more considerably. Considering all the additional expenses to which the plaintiff will inevitably be subjected because of medication, treatment, X-rays and forced rests, the amount remaining after accrued costs and disbursements, will be none too much as he limps across the span of life left to him in the arduous years of this fast-moving twentieth century which has little or no time for cripples.

I would affirm the verdict of $35,000.